Stephen M. Doniger (SBN 179314)
stephen@donigerlawfirm.com
David Shein (SBN 230870)
david@donigerlawfirm.com
Nelson A. Campbell (SBN 357579)
ncampbell@donigerlawfirm.com
DONIGER / BURROUGHS
603 Rose Avenue
Venice, California 90291
Telephone: (310) 590-1820
Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

ADRIANNE HARRIS, an individual, ALEKSANDRA KANIAK, an individual, ANDREA CARTER-MEIER, an individual, CAROL STOELTING, an individual, DAKOTA SAL, an individual, DEENA TRAINA, an individual, EMMA WARD, an individual, JENNIFER CAPRICCIO, an individual, LISA CLYDE, an individual, NANCY WETZEL, an individual, SHAY YUVAL, an individual, VICKI HANSON, an individual,

Plaintiffs,

v.

BRAND BOLT, LLC, a Delaware limited liability company; MIAMI SKINCARE, LLC, a Delaware limited liability company; MIAMIMD, LLC, a Florida limited liability company; and DOES 1-10,

Defendants.

Case No.: 2:26-cv-02332-BFM
*Hon. Brianna Fuller Mircheff*

**FIRST AMENDED COMPLAINT FOR:**
1. **BREACH OF WRITTEN CONTRACT;**
2. **BREACH OF WRITTEN CONTRACT;**
3. **MISAPPROPRIATION OF LIKENESS IN VIOLATION OF CAL. CIV. CODE § 3344;**
4. **MISAPPROPRIATION OF LIKENESS UNDER COMMON LAW**

JURY TRIAL DEMANDED

Plaintiffs Adrianne Harris, Aleksandra Kaniak, Andrea Carter-Meier, Carol Stoelting, Dakota Sal, Deena Traina, Emma Ward, Jennifer Capriccio, Lisa Clyde, Nancy Wetzel, Shay Yuval, and Vicki Hanson (individually a "Plaintiff" and collectively, "Plaintiffs") by and through their undersigned attorneys, hereby pray to this honorable Court for relief based on the following:

**JURISDICTION & VENUE**

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiffs and Defendants and each Plaintiff's claims exceed the sum of $75,000, exclusive of interest and costs. Plaintiff Nancy Wetzel is a resident and citizen of the State of Georgia; all other Plaintiffs are residents and citizens of the State of California. Defendant Brand Bolt, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Colorado. Defendant Miami Skincare, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Delaware. Defendant MiamiMD, LLC is a limited liability company organized under the laws of the State of Florida with its principal place of business in Florida. Plaintiffs are informed and believe and, on that basis, allege that no member of Brand Bolt, LLC, Miami Skincare, LLC, or MiamiMD, LLC is a citizen of the State of California or the State of Georgia.

2. This Court has personal jurisdiction over Brand Bolt because Brand Bolt purposefully directed its conduct into California, contracted through a California licensed talent agency for the services of California models and actors, accepted limited usage rights governed by California-centered booking documents, and consented in the Booking Agreement to the jurisdiction and venue of the state and federal courts located in California for disputes arising from the booking.

3. This Court has personal jurisdiction over Miami Skincare because, on information and belief, Miami Skincare directly funded, managed, approved, placed, published, re-published, targeted, re-targeted, and/or caused paid digital advertising campaigns using Plaintiffs' names, voices, images, testimonial footage, likenesses, and personas to promote Miami MD / MiamiMD products, including advertisements directed to, served in, and tracked from California, and arising out of a California booking and a California talent-agency relationship. Brand Bolt's manager, Jonathon Cole, has confirmed that Brand Bolt and Miami Skincare have a business partner based in California who, in his capacity for the entities, handles advertising purchases on behalf of the entities and identified that partner as Omer Goldstein of Woodland Hills, California. Miami Skincare's advertising purchases were therefore made from, and directed into, California.

4. This Court has personal jurisdiction over MiamiMD, LLC because, on information and belief, MiamiMD, LLC operated, controlled, administered, or financially benefited from the consumer-facing Miami MD / MiamiMD e-commerce channel to which the challenged advertisements were directed, including advertisements served to, and purchases made by, California consumers; knowingly sold, processed payment for, and shipped Miami MD / MiamiMD products to consumers located in California through that channel; and participated in, approved, ratified, or profited from the unauthorized use and re-use of Plaintiffs' likenesses in California-directed advertising. Plaintiffs' claims against MiamiMD, LLC arise out of and relate to those California-directed activities.

5. Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2) in that this is the judicial district in which a substantial part of the acts and omissions giving rise to the claims occurred and Brand Bolt, LLC consented to the exclusive jurisdiction and venue of the state and federal courts located in California regarding the Booking Agreement at issue in this case.

**PARTIES**

6. Plaintiff Adrianne Harris ("Harris") is an individual who, at all times relevant hereto, was and is a citizen and resident of the State of California.

7. Plaintiff Aleksandra Kaniak ("Kaniak") is an individual who, at all times relevant hereto, was and is a citizen and resident of the State of California.

8. Plaintiff Andrea Carter-Meier ("Carter-Meier") is an individual who, at all times relevant hereto, was and is a citizen and resident of the State of California.

9. Plaintiff Carol Stoelting ("Stoelting") is an individual who, at all times relevant hereto, was and is a citizen and resident of the State of California.

10. Plaintiff Dakota Sal ("Sal") is an individual who, at all times relevant hereto, was and is a citizen and resident of the State of California.

11. Plaintiff Deena Traina ("Traina") is an individual who, at all times relevant hereto, was and is a citizen and resident of the State of California.

12. Plaintiff Emma Ward ("Ward") is an individual who, at all times relevant hereto, was and is a citizen and resident of the State of California.

13. Plaintiff Jennifer Capriccio ("Capriccio") is an individual who, at all times relevant hereto, was and is a citizen and resident of the State of California.

14. Plaintiff Lisa Clyde ("Clyde") is an individual who, at all times relevant hereto, was and is a citizen and resident of the State of California.

15. Plaintiff Shay Yuval ("Yuval") is an individual who, at all times relevant hereto, was and is a citizen and resident of the State of California.

16. Plaintiff Vicki Hanson ("Hanson") is an individual who, at all times relevant hereto, was and is a citizen and resident of the State of California.

17. Plaintiff Nancy Wetzel ("Wetzel") is an individual who is a citizen and resident of the State of Georgia and was at certain relevant times hereto, a resident of California.

18. Plaintiffs are informed and believe and, on that basis, allege that Defendant Brand Bolt, LLC ("Brand Bolt") is a Delaware limited liability company with its principal place of business in the State of Colorado. Brand Bolt executed the Booking Agreement, accepted the limited one-year usage rights at issue, and is the only Defendant that received any grant of rights from Plaintiffs or D2. Upon information and belief, Brand Bolt owns or controls the "MiamiMD" trademark, does business under or in connection with the Miami MD / MiamiMD brand, and commercially benefited from the challenged advertising.

19. Plaintiffs are informed and believe and, on that basis, allege that Defendant Miami Skincare, LLC ("Miami Skincare") is a Delaware limited liability company with its principal place of business in the State of Delaware and that Miami Skincare independently funded, managed, approved, placed, published, re-published, targeted, re-targeted, and/or caused Google-side and other Miami MD / MiamiMD advertising campaigns using Plaintiffs' media, employing its own corporate capital, personnel, vendors, advertising-account access, budget authority, billing arrangements, and campaign-management authority. Miami Skincare's liability is direct and does not depend on any alter ego theory. Those allegations are based on Defendants' own records and admissions in this action: Miami Skincare is the original operating entity of the business, having been organized in Florida under the name "Brand Bolt LLC" and renamed "Miami Skincare LLC" in 2020 by articles of amendment that Cole signed as its Authorized Manager; Brand Bolt is Miami Skincare's manager; employees of Brand Bolt perform work on the MiamiMD brand; and Cole has sworn that the entities' California-based partner "handles advertising purchases on behalf of the entities," Brand Bolt and Miami Skincare alike.

20. Jonathon Cole ("Cole") is the owner, managing member, and/or principal officer of both Brand Bolt and Miami Skincare. Cole has acknowledged under oath in this action that he is the Manager and an officer of both Brand Bolt and

Miami Skincare and that, in that capacity, he participated in email correspondence and telephone calls relating to the planning of the Shoot. Cole is not named as a defendant in this First Amended Complaint, and the allegations concerning Cole set forth herein are pleaded solely as factual context bearing on the knowledge, common control, ratification, and operational conduct of the entity Defendants.

21. Plaintiffs are informed and believe and, on that basis, allege that Defendant MiamiMD, LLC ("MiamiMD LLC") is a Florida limited liability company which operates or has operated the primary consumer-facing Miami MD / MiamiMD e-commerce storefront, websites, landing pages, checkout flows, and affiliate and payment-processing arrangements to which the challenged advertisements were directed and through which the advertised products were sold. MiamiMD LLC was not a party to the Booking Agreement, was not a releasee under any Model Release, and received no license, sublicense, assignment, release, or other authorization from Plaintiffs or D2 to use Plaintiffs' media.

22. Plaintiffs are informed and believe and, on that basis, allege that Peter Kell ("Kell") was a co-founder and representative of Brand Bolt and executed the Booking Agreement in that capacity, and that Kell thereafter used Ad Venture Holdings, LLC to manage, fund, place, optimize, and execute Meta-platform Miami MD / MiamiMD advertising campaigns that used Plaintiffs' likenesses. Upon information and belief, Kell operated from and directed that campaign activity within the State of California, and the remaining Defendants accepted, ratified, and profited from the revenue and customer acquisition generated by that California-based activity.

23. Plaintiffs plead the following in the alternative and in addition to each Defendant's direct conduct. Plaintiffs are informed and believe and, on that basis, allege that Miami Skincare and Brand Bolt share common ownership, management, and control under Cole, commingle funds, use the same offices, personnel, vendors,

and advertising accounts, operate as a single business enterprise, and hold themselves out to the public interchangeably as "Miami MD" and "MiamiMD," such that each is the alter ego of the other. Plaintiffs are further informed and believe, and on that basis allege, that neither Brand Bolt nor Miami Skincare filed a fictitious business name statement authorizing it to operate under the name "Miami MD" or "MiamiMD" in its state of organization or principal place of business, and that Defendants nevertheless used that unregistered alias interchangeably across entities in contracts, advertising, and consumer-facing sales channels, in disregard of corporate formalities and in a manner that obscured which entity was responsible for the challenged conduct. Adherence to the fiction of separate entity status would promote injustice. Plaintiffs further plead agency, ratification, conspiracy, common control, equitable estoppel, and single-business-enterprise theories in the alternative. To the extent any Defendant contends that it was entitled to use Plaintiffs' media by reason of the Booking Agreement, that Defendant is equitably estopped from disclaiming the Booking Agreement's corresponding obligation to notify D2 Models and to negotiate additional fees before any extended or additional use.

24. Miami Skincare, LLC was formerly known as Brand Bolt, LLC. In 2020, Brand Bolt, LLC's name was changed to Miami Skincare, LLC, and a new Brand Bolt, LLC was formed in Delaware that took ownership of Miami Skincare, LLC. In September 2020, Miami Skincare amended its filings to remove Cole and Kell as its managers and designated the new Brand Bolt as its sole manager.

25. Cole states that "Brand Bolt, LLC is the manager of Miami Skincare, LLC," "[e]mployees of Brand Bolt, LLC also perform work on the MiamiMD brand," Brand Bolt is a "partial owner" of Miami Skincare and Cole "holds ultimate authority over the business" with "all persons in the company report[ing] to [him]." Cole produced "an operating agreement for the entities" — a single agreement — in response to a request for the governing documents of both Miami Skincare and Brand

Bolt. Cole refers to Brand Bolt and Miami Skincare interchangeably as "the business" and "the company." Brand Bolt and Miami Skincare share common ownership and ultimate control under Cole, management, employees, the MiamiMD brand and its advertising operations, and the California-based partner who purchases their advertising.

26. Plaintiffs are informed and believe and, on that basis, allege that Defendants, at all times relevant to this action, were the agents, servants, partners, joint venturers and employees of each of the other Defendants and in doing the acts alleged herein were acting with the knowledge and consent of each of the other Defendants in this action. Alternatively, at all times mentioned herein, each of the Defendants conspired with each other to commit the wrongful acts complained of herein. Therefore, each Defendant is liable for the acts of all of the other conspirators. Where this First Amended Complaint refers to "Defendants" collectively, Plaintiffs allege that each Defendant participated in, directed, authorized, funded, or ratified the conduct described in the manner specifically alleged as to that Defendant herein, and the conduct of each Defendant is separately alleged in the Third and Fourth Claims for Relief below.

27. Plaintiffs are unaware of the true names and capacities of the Defendants sued herein as Does 1 through 10, inclusive, and for that reason, sue such Defendants under such fictitious names. Plaintiffs are informed and believe and, on that basis, allege that such fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by the conduct of said Defendants. On information and belief, the Doe Defendants include related Miami MD / MiamiMD operating entities, advertising vendors, media buyers, account managers, affiliate-program operators, website operators, funnel operators, landing-page operators, checkout-flow operators, creative vendors, analytics providers, payment-processing operators, merchant-

account operators, customer-service operators, and fulfillment operators that participated in, approved, funded, placed, managed, optimized, published, re-published, targeted, re-targeted, monetized, financially benefited from, or caused the challenged advertisements or the related sales funnels. Plaintiffs will seek to amend the complaint when the names and capacities of such fictitiously named Defendants are ascertained.

## FACTUAL STATEMENT

28. Defendants manufacture, market, distribute, and sell beauty and skincare products, including a "lift and firm" beauty cream, under the brand names "MiamiMD."

29. Upon information and belief, Cole founded and controls the business operations of both Brand Bolt and Miami Skincare and directed and oversaw the marketing campaigns that utilized Plaintiffs' likenesses and professional testimonials. Through that shared ownership, management, and operational control, Miami Skincare knew or should have known that Plaintiffs' media originated from a limited 2021 D2 booking, that any usage rights were time-limited and that any use after expiry of the term required notice to D2, authorization from Plaintiffs, and the negotiation of additional fees.

30. Plaintiffs are professional actors and models, each of whom was represented at all relevant times by Direct2Pro, LLC d/b/a D2 Models ("D2"), a talent agency licensed by the State of California.

31. On or about February 9, 2021, Brand Bolt, through its representative Peter Kell, entered into a Booking Agreement with D2 for the services of Plaintiffs (the "Booking Agreement"). A true and correct copy of the Booking Agreement is attached hereto as **Exhibit A** and is incorporated herein by reference.

32. The Booking Agreement was assigned Job # LAX-210201-BBOMAR and provided for on-camera video work by the Plaintiffs for Brand Bolt. The

Assignment Description stated that "Models will take part in the creation of professional testimonials for a lift and firm beauty cream product." Subsequent to the execution of the Booking Agreement, Plaintiffs provided such on-camera video work for Brand Bolt (the "Services") in connection with the Brand Bolt shoot (the "Shoot").

33. In relevant part, the Booking Agreement expressly limited Defendants' authorized use of Plaintiffs' testimonials to a one-year term and to video media only. The Assignment Description provided: "Usage is limited to the following: REGION: Worldwide (including USA) / DURATION: 1 year / MEDIA: All Social Media Platforms – Video; All Internet/Digital/Mobile Advertising – Video / RESTRICTIONS: By Brand Bolt LLC (dba: 'MiamiMD' and dba: 'Cella Beauty') only. No broadcast or commercial advertising use other than the media types specified above are permitted." The Booking Agreement further expressly required that, for any usage beyond the initial permitted use, "It is the Client's responsibility to notify D2 Models and to negotiate additional fees (including extensions of existing agreements) for any usage, which may be required or anticipated subsequent to the time of booking."

34. That contractual notice obligation was material. It allocated to Brand Bolt — and not to Plaintiffs or D2 — the responsibility to disclose any extended or additional use before that use occurred and before Plaintiffs' likenesses were redeployed in advertising beyond the limited authorized term. Plaintiffs and D2 were entitled to rely on that affirmative contractual duty and had no reason to assume that Brand Bolt, or any entity acting through the Miami MD / MiamiMD advertising channel, would use and re-use, edit and re-edit, publish and re-publish, target and re-target Plaintiffs' likenesses without notice, consent, or payment.

35. Plaintiffs are third-party beneficiaries of the Booking Agreement. The Booking Agreement was entered into for the express purpose of engaging Plaintiffs

to provide professional modeling and testimonial services. Plaintiffs' names, or the professional names under which they work, are specifically listed on the Booking Agreement, and the agreement's terms governing duration, media, and usage restrictions were intended to protect Plaintiffs' rights in their likenesses and performances. Plaintiffs fulfilled their obligations under the Booking Agreement by providing the Services.

36. In connection with the production of the Shoot, each Plaintiff individually executed a Limited Artist Release (the "Model Release") directly with Brand Bolt. Each Model Release bears the same Job # LAX-210201-BBOMAR as the Booking Agreement. A true and correct copy of each Plaintiff's Model Release is attached hereto as **Exhibit B** and is incorporated herein by reference.

37. The Model Release granted Brand Bolt consent to use Plaintiffs' likenesses and the video footage captured during the Shoot (hereinafter "Footage"), for a term of one year only.

38. The Booking Agreement further provides that the Model Releases are subordinate to, and are voided in full by, any breach of the Booking Agreement's usage terms. It states: "All terms on the model release must match those on the voucher and in this Agreement or that release is not valid. Breaking any of the usage terms specified in this agreement or specified on any model voucher shall void in full any and all terms and provisions specified in any model or talent release document legitimately executed by the Model(s) named herein, their parent or legal guardian, or their legal representative."

39. Defendants breached the Booking Agreement's usage terms by using Plaintiffs' media after the one-year term, by extracting still images from the licensed video footage and deploying them in static advertising in violation of the video-only media restriction, and by failing to notify D2 Models and to negotiate additional fees before any extended or additional use. Upon those breaches, the foregoing provision

was triggered and the Model Releases were voided in full. In any event, no Model Release authorized the challenged post-expiration, non-video, additional, modified, re-used, re-published, targeted, re-targeted, or otherwise unauthorized uses. Defendants thereafter used and re-used Plaintiffs' likenesses through paid advertisements and, as alleged below, repeatedly edited and re-edited, published and re-published, targeted and re-targeted advertisements containing those likenesses. Each such advertisement was deployed without valid consent for the challenged use.

40. Each of the Plaintiffs performed their respective obligations under both foregoing agreements.

41. The one-year authorized usage period under both the Booking Agreement and the Model Release expired on or about February 28, 2022.

**DEFENDANTS' POST-EXPIRATION PAID ADVERTISING DEPLOYMENTS AND REPUBLICATIONS**

42. Despite the expiration of the authorized usage period, Defendants did not merely leave a single legacy video in one static public location. Defendants repeatedly used and re-used, edited and re-edited, published and re-published, activated and reactivated, translated, adapted, targeted and re-targeted, and redeployed Plaintiffs' names, voices, photographs, images, testimonial footage, likenesses, identities, and personas in paid commercial advertising to market, promote, and sell Defendants' beauty products under the "MiamiMD" brand and other brand names.

43. Defendants' unauthorized uses were not neutral or editorial uses. They were paid commercial advertisements deployed through Meta, Google, and/or other paid advertising systems, including social media platforms, internet advertising, digital and mobile advertising, ad-supported mobile applications and mobile games, websites, landing pages, and affiliate funnels. Those advertisements comprised multi-format, multi-channel campaigns and included video advertisements, edited and re-

edited video advertisements, long-form testimonial advertisements, shortened and altered video advertisements, static-image advertisements extracted from the testimonial footage, Spanish-language advertisements, advertisements using altered model and character associations, and other creative variations.

44. As used in this First Amended Complaint, "targeting" and "re-targeting" refer to the process by which Defendants caused paid digital advertisements to be delivered to selected or re-selected audience pools through platform advertising systems, including Meta, Google, and/or other advertising platforms. Those audience pools were selected or re-selected based on campaign settings, delivery criteria, platform data, optimization signals, placement availability, language, geography, user behavior, interests, demographics, performance data, and other audience-selection factors. A paid digital advertisement is not merely posted online for the same general public to view indefinitely; it is delivered through advertising systems that decide when, where, how often, and to whom the advertisement will be served.

45. On information and belief, each new platform-generated ad identifier ("ad ID"), campaign launch, relaunch, activation, reactivation, creative edit, translated version, static-image extraction, platform deployment, targeting change, re-targeting decision, or renewed paid delivery cycle caused Plaintiffs' likenesses to be directed to a newly selected or re-selected audience pool through the relevant platform's delivery system. Each such deployment was therefore not only a new publication event but also a new audience-selection event.

46. On information and belief, each platform-generated ad ID reflected a discrete paid advertising deployment within Defendants' advertising accounts, and not merely a duplicate label for one aggregate advertisement. Each such ad ID was associated with its own platform tracking, delivery, reporting, optimization, audience selection, spend accrual, and performance measurement, and each such deployment

structure could be paused, resumed, modified, measured, billed, analyzed, attributed, and monetized separately.

47. On information and belief, each challenged advertisement was subject to Defendants' advertising budgets, spending limits, billing arrangements, payment thresholds, invoices, campaign and ad-set budgets, optimization settings, and other financial authorization within Defendants' advertising accounts, and Defendants accrued advertising costs as the advertisements were served. The challenged advertisements were therefore not legacy media passively remaining online. They were individual paid commercial deployments that Defendants authorized, funded, managed, used and re-used, published and re-published, targeted and re-targeted, and financially supported after the authorized usage period expired.

48. Defendants could have ceased using Plaintiffs' likenesses, allowed a single advertisement to remain static, modified an existing advertisement within a single existing deployment structure, or used non-infringing creative. Indeed, Plaintiffs' investigation identified other Miami MD / MiamiMD advertisements that did not feature Plaintiffs at all. Instead, Defendants repeatedly generated, launched, relaunched, activated, reactivated, modified, translated, used and re-used, edited and re-edited, published and re-published, targeted and re-targeted, and redeployed advertisements using Plaintiffs' likenesses through distinct platform-generated ad IDs and distinct campaign actions. Defendants' repeated inclusion of Plaintiffs' likenesses was therefore a deliberate creative, advertising, and commercial choice, not an unavoidable or incidental feature of Defendants' marketing.

49. The following examples of Defendants' post-expiration publications and republications are representative and non-exhaustive. Plaintiffs expect discovery to reveal additional advertisements, ad IDs, platforms, placements, creative files, campaign records, targeting and re-targeting settings, budgets, invoices, performance reports, revenues, profits, and internal communications.

50. Within two years of the filing of the original Complaint in this action, Defendants generated or deployed distinct advertisements with materially varied video durations, including, without limitation, versions of approximately 17 minutes, 18 minutes, 19 minutes, 20 minutes, and 38 minutes. These duration changes were not passive continuations of one original video. They reflected separate creative assets, separate editing and re-editing decisions, separate campaign deployments, and separate audience-selection processes through which Defendants used and re-used, edited and re-edited, published and re-published, targeted and re-targeted Plaintiffs' likenesses for commercial gain.

51. On or about January 23, 2025, Defendants extracted still images from Plaintiffs' testimonial video footage and used those still images in static Google advertising creative, documented through Google advertising records and platform-generated advertising identifiers, including without limitation Google advertising identifier 06046597019647082497. Because the Booking Agreement and the Model Releases authorized limited video use only, the extraction and deployment of static-image advertisements constituted a new medium, a new adaptation, a new use and re-use, a new publication and re-publication, and a new paid platform deployment of Plaintiffs' likenesses directed to a newly selected or re-selected audience pool.

52. On or about April 23, 2025 — after Plaintiffs and D2 had objected to the unauthorized use — Defendants created, launched, or caused an advertisement featuring Plaintiffs Vicki Hanson and Lisa Clyde, who had not appeared in earlier advertisements. That deployment constituted a new commercial publication and re-publication because Defendants made a new decision to use and re-use Plaintiffs' likenesses in a paid advertising campaign after notice and after the original usage period expired. On information and belief, that deployment targeted or re-targeted Plaintiffs' likenesses to a newly selected or re-selected audience pool through the applicable platform's delivery system.

53. On or about August 15, 2025, Defendants created, launched, or caused an advertisement that altered the association between Plaintiffs, fictitious customer names, voiceovers, and testimonial content, substituting Plaintiff Emma Ward for Plaintiff Deena Traina while retaining the same fictitious endorser name, “Beverly Gaffney.” That advertisement was not passive continued use of a prior publication. Defendants changed the creative presentation, edited and re-edited the advertising content, and redeployed, published and re-published, targeted and re-targeted Plaintiffs’ likenesses in a new commercial advertising asset directed to a newly selected or re-selected audience pool.

54. On or about September 19, 2025, Defendants launched or caused at least four newly generated advertisements on the Meta platform using Spanish-language voiceovers and Spanish on-screen copy. Those advertisements required affirmative creative production, including translation, Spanish-language voiceover or audio, Spanish on-screen copy, editing, syncing, formatting, platform upload, and paid deployment. By translating and adapting Plaintiffs’ testimonial footage for Spanish-language advertising, Defendants created and deployed materially altered commercial advertising assets directed to a new linguistic audience and to newly selected or re-selected audience pools.

55. Plaintiffs’ investigation identified substantial additional platform-generated unique ad ID activity following each of the representative republication events described above. On information and belief, Defendants ran or caused at least 197 additional unique ad IDs using Plaintiffs’ likenesses after the January 23, 2025 static-image deployment, at least 106 additional unique ad IDs after the April 23, 2025 deployment, at least 39 additional unique ad IDs after the August 15, 2025 altered testimonial configuration, and at least 19 additional unique ad IDs after the September 19, 2025 Spanish-language deployments.

56. Each newly generated, launched, relaunched, activated, reactivated, materially altered, translated, newly platformed, newly targeted, or re-targeted paid advertisement constituted a separate commercial use, re-use, publication, and/or re-publication of Plaintiffs' names, voices, photographs, images, testimonial footage, likenesses, identities, and personas, independently triggering a new limitations period as to that advertisement.

## TIME AND MANNER OF DISCOVERY AND PLAINTIFFS' INABILITY TO DISCOVER EARLIER

57. On or about January 5, 2025, Plaintiffs first learned of Defendants' unauthorized post-expiration advertising when one Plaintiff's mother encountered an advertisement containing Plaintiffs' likenesses on the ad-supported mobile game Candy Crush. Said Plaintiff is not herself a senior citizen. That discovery was a fortuitous third-party encounter in a mobile-game advertising environment, and not the result of any static public posting that Plaintiffs could have located through ordinary searching.

58. That fortuitous encounter gave Plaintiffs and D2, for the first time, a concrete advertiser, brand, platform context, and creative asset to investigate. Plaintiffs and D2 then conducted a targeted investigation using screenshots, video captures, platform-generated advertising records, Meta advertising records, Google advertising records, and other available public-facing evidence to identify additional unauthorized advertisements.

59. Before the January 5, 2025 discovery, Plaintiffs and D2 did not know, and had no practical way to know, that Defendants were using Plaintiffs' likenesses in paid programmatic advertising campaigns after the authorized usage period expired. The challenged advertisements were not static public website posts that Plaintiffs could reliably or reasonably locate (notwithstanding the fact that there was no obligation on Plaintiffs' part to do such a search in the first place) by visiting a

known URL or running ordinary name searches. They were paid digital advertisements delivered through platform systems to users selected or re-selected by platform algorithms and nonpublic delivery criteria, and they were therefore functionally invisible to anyone to whom Defendants did not direct them, including Plaintiffs.

60. Plaintiffs and D2 could not know in advance which platforms, applications, mobile games, websites, landing pages, ad networks, audience pools, placements, devices, geographic regions, languages, affiliate funnels, or campaign settings Defendants were using to serve the challenged advertisements. Reasonable diligence did not require Plaintiffs or D2 to police, on a worldwide and indefinite basis, every social media platform, search engine, ad-supported mobile application, mobile game, third-party ad network, connected-television or over-the-top placement, broadcast placement, website, landing page, affiliate funnel, or advertising transparency archive on the chance that a former client had secretly redeployed video footage, still images, edited clips, translated versions, or other derivative uses after the authorized period expired.

61. The practical burden of earlier discovery was compounded by the length of the challenged advertisements. Many of the challenged video advertisements were long-form commercial advertisements, including representative advertisements of approximately 17 minutes or longer. To determine whether Plaintiffs appeared in Defendants' advertising, Plaintiffs or D2 would have had to first locate Defendants' advertisements across unknown platforms and placements and then watch or review each advertisement closely enough to determine whether any Plaintiff appeared. That burden was especially unreasonable because Defendants also ran Miami MD / MiamiMD advertisements that did not contain Plaintiffs' likenesses, so that the mere existence of a Miami MD / MiamiMD advertisement disclosed nothing about whether it made unauthorized use of Plaintiffs' media.

62. Plaintiffs' later use of Meta and Google advertising transparency tools did not make the challenged advertisements reasonably discoverable before January 5, 2025. Those tools functioned as investigative archives that Plaintiffs and D2 consulted only after they had a concrete reason to investigate Defendants' Miami MD / MiamiMD advertising. The actionable commercial exploitation occurred when Defendants paid to serve, target, re-target, optimize, and deliver Plaintiffs' likenesses into algorithmically selected feeds, applications, websites, mobile-game environments, and other digital advertising placements — not when Plaintiffs later used advertising records to document the scope of the violations. The existence of transparency archives imposed no duty on Plaintiffs or D2 to search every archive for every former client.

63. Unlike a centralized public database or fixed public profile page that a member of the public could search without first knowing of the violation, Defendants' paid advertisements were delivered through opaque platform systems that selected recipients based on nonpublic targeting and delivery criteria. Plaintiffs were not one ordinary search away from discovering the advertisements; they first needed to know that Defendants were still using their likenesses at all. That the later-obtained records identify ad IDs, campaign information, or other advertising data does not mean Plaintiffs could have known earlier which campaigns existed, which platforms or placements Defendants used, which audiences Defendants targeted or re-targeted, or when Defendants directed Plaintiffs' likenesses to newly selected or re-selected audience pools.

64. Plaintiffs' delayed discovery was further reasonable because Brand Bolt expressly assumed the affirmative contractual duty to notify D2 Models and to negotiate additional fees before any extended or additional use, and because Defendants breached that duty to speak while deploying the advertisements once the term expired. Defendants' February 11, 2025 response to D2's notice — "We are no

longer using any content from your shoot and thus will not be paying a penny" — did not identify the platforms, ad IDs, creative versions, dates of use, revenues, or entities involved, did not disclose any still-running or later-launched advertisements, and did not give Plaintiffs or D2 the platform-level information necessary to uncover the full universe of unauthorized uses without further investigation and discovery.

65. Paid advertisements on the Meta platform are not posts on an advertiser's public page. On information and belief, when an advertiser creates an advertisement through Meta's Ads Manager, the platform generates an unpublished page post — known in the advertising industry as a "dark post" — which exists solely as a paid placement, is assigned its own post identifier, and is never published to the advertiser's page or timeline. Such an advertisement is delivered only into the individual feeds of the users the advertiser and the platform's delivery system select. It is not visible to anyone outside that selected audience, and it does not appear anywhere on the advertiser's public page. This is the default architecture of the platform, not an optional concealment setting.

66. Accordingly, a person who suspected that Defendants were using her likeness and who went to Defendants' Miami MD / MiamiMD page to check would have seen nothing. Visiting the advertiser's public page, following the brand, reviewing its organic posts, or monitoring its public social media presence would not have revealed the challenged advertisements, because the challenged advertisements were never posted there.

67. On information and belief, the challenged advertisements had no persistent, publicly accessible web address. Each impression was assembled and delivered to a particular user, on a particular device, at a particular moment, inside an authenticated application or feed. Advertisements delivered in that manner are not crawled or indexed by Google, Bing, or any general-purpose search engine. Plaintiffs

could not have found the challenged advertisements by searching their own names, by searching Defendants' brand names, or by any other ordinary internet search.

68. On information and belief, Defendants further narrowed the audiences for the challenged advertisements through the audience-selection controls the platforms make available to advertisers, which include age range, gender, geography, language, inferred interests, inferred behaviors, lists of the advertiser's own customers, website and application activity captured through tracking pixels and software development kits, audiences modeled on those lists, and re-targeting of users who previously interacted with the advertiser. Beyond the parameters an advertiser selects, the platforms' delivery systems independently narrow the audience further: delivery is decided impression by impression by automated auction and optimization models that predict which users are most likely to respond, with the result that advertisements are systematically concentrated on some demographic groups and withheld from others even when the advertiser's own targeting parameters are broad or neutral.

69. On information and belief, that optimization effect operated here to Plaintiffs' particular disadvantage. The challenged advertisements marketed an anti-aging beauty product. On information and belief, Defendants' campaigns were directed, and the platforms' delivery systems further optimized those campaigns, toward older consumers most likely to purchase such products. Plaintiffs — working professional models — were not within the audiences to which Defendants directed the advertisements, and the advertisements were therefore not delivered to them. The circumstances of the January 5, 2025 discovery illustrate the point: the advertisement surfaced not to any Plaintiff, but to an elderly third party, in a mobile game.

70. The mobile-game placement compounds the problem. On information and belief, advertisements served inside ad-supported mobile applications such as Candy Crush are delivered through third-party advertising networks and mediation

platforms embedded in the application itself. Advertisements delivered through those in-application networks appear on no website, have no public address, and are collected in no public archive, index, or repository of any kind. There is no tool, public or otherwise available to Plaintiffs, by which a person could determine after the fact what advertisements were served inside a given mobile application, or ask whether her likeness had appeared in one.

71. Nor did the platforms' advertising transparency tools provide a means of earlier discovery. On information and belief, Meta's Ad Library displays ordinary commercial advertisements only while those advertisements are actively running; unlike advertisements concerning elections, politics, or social issues, which Meta retains for seven years, an ordinary commercial advertisement ceases to be searchable or viewable in the Ad Library once the advertiser stops running it. On information and belief, Google likewise offered no public, searchable repository of advertiser creative during the earlier years of Defendants' unauthorized use. A person searching either tool could therefore learn only what a given advertiser happened to be running at the moment of the search. Neither tool would have disclosed advertisements that had already run and stopped, and neither tool could have told Plaintiffs, at any time before January 5, 2025, that Defendants had ever used their likenesses at all.

72. The challenged advertisements were therefore inherently secretive as to Plaintiffs. They were not placed where Plaintiffs had access, or any reason to seek access. Defendants selected who would receive them; Plaintiffs were not among those recipients; and no public page, search engine, archive, index, or repository available to Plaintiffs would have revealed them. That a targeted advertisement is delivered to a large number of strangers does not make it publicly available to the person whose likeness it exploits.

73. Defendants did not notify D2 Models or Plaintiffs of their intent to use Plaintiffs' testimonials and likenesses beyond the one-year period, as required by the

Booking Agreement nor did Defendants negotiate or pay any additional fees for their use of Plaintiffs' testimonials and likenesses beyond the one-year period, as would have been required under the Booking Agreement and Model Release.

**NOTICE, POST-NOTICE CONDUCT, AND WILLFULNESS**

74. On January 28, 2025, D2 Models notified Defendants in writing that images and videos of Plaintiffs captured in 2021 were still being used online beyond the expiration of the usage term, set out the governing usage terms, and proposed usage-expansion and extension options to resolve the matter.

75. On or about February 11, 2025, Defendants responded to D2's notice, stating: "We are no longer using any content from your shoot and thus will not be paying a penny." That statement was false, misleading, or incomplete, because at least 189 additional platform-generated ad IDs using Plaintiffs' likenesses ran after that response.

76. In or about March 2025, D2 Models, acting in its capacity as Plaintiffs' California licensed talent agent, sent Defendants a cease-and-desist demand on behalf of Plaintiffs, demanding that Defendants stop using Plaintiffs' images, likenesses, and testimonials without authorization. Defendants did not comply with that demand.

77. On or about March 27, 2025, Defendants responded to D2's cease-and-desist demand, stating: "Although we do not agree with this assertion and believe this shake down is nonsense here is what we are willing to do. We will pay a $10k one time fee(total) for retroactive use of the footage we already paid for and license through EOY." Defendants' reference to retroactive use and to a proposed license running through the end of the year confirms that the dispute concerned ongoing and anticipated commercial exploitation of Plaintiffs' footage, and not merely an old passive publication that Defendants were unable to stop.

78. On information and belief, after Plaintiffs' initial discovery, Defendants ran or caused at least 206 additional platform-generated ad IDs using Plaintiffs'

likenesses; after Defendants' February 11, 2025 response denying ongoing use, Defendants ran or caused at least 189 additional ad IDs; and after Defendants' March 27, 2025 response, Defendants ran or caused at least 142 additional ad IDs.

79. After receiving D2's March 2025 cease-and-desist demand, Defendants generated, launched, used and re-used, edited and re-edited, published and re-published, targeted and re-targeted additional creative assets, including without limitation the April 2025 advertisements featuring additional Plaintiffs, the August 2025 altered testimonial configurations, and the September 2025 Spanish-language advertisements described above.

80. On September 24, 2025, Plaintiffs' counsel sent Defendants a cease-and-desist letter demanding that Defendants immediately cease and desist from all uses of Plaintiffs' professional testimonials and likenesses and requesting an accounting of all unauthorized uses and related revenues and profits. Defendants did not provide the requested accounting.

81. Defendants' conduct was not an accidental overrun, a clerical mistake, or a passive failure to remove legacy content. It reflected conscious and deliberate decisions to renew, modify, expand, and profit from the commercial use of Plaintiffs' likenesses after Defendants knew the usage rights had expired, knew no additional fees had been negotiated or paid, knew Plaintiffs and D2 had objected, and had repeated opportunities to stop. On information and belief, the post term advertising was authorized, directed, approved, or ratified by one or more officers, directors, managing agents, owners, principals, or persons exercising substantial control over Defendants' advertising, brand, revenue, and campaign operations. Defendants' unauthorized use was and is willful, knowing, and deliberate.

## MIAMI SKINCARE'S DIRECT CONDUCT AND THE MIAMI MD / MIAMIMD SALES CHANNEL

82. On information and belief, Miami Skincare directly participated in the unauthorized commercial use, re-use, publication, re-publication, targeting, and re-targeting of Plaintiffs' likenesses by funding, managing, approving, placing, publishing, re-publishing, targeting, re-targeting, or causing Google-side and other Miami MD / MiamiMD advertising campaigns, including campaigns identified through Google advertising records and platform-generated advertising identifiers. Miami Skincare used its own corporate resources, Google advertising access, personnel, vendors, budget authority, billing arrangements, and campaign-management authority to do so.

83. On information and belief, the Meta-platform advertisements containing Plaintiffs' likenesses linked to trymiamimd.com, and Google-side advertisements linked to miamimd.co or related Miami MD / MiamiMD websites, landing pages, checkout flows, or sales funnels operated or administered by MiamiMD LLC and/or Doe Defendants. Those storefronts were operated in coordination with, and for the benefit of, Brand Bolt and Miami Skincare: when D2 sent written notice of the unauthorized use on February 11, 2025 to the customer-support addresses for trymiamimd.com and miamimd.co, it was Cole — Brand Bolt's founder — who answered that same day from his Brand Bolt email account. Plaintiffs do not yet know the full ownership, control, account-access, revenue-allocation, payment-processing, merchant-account, affiliate-account, customer-service, fulfillment, or operating-entity structure for those websites, advertising funnels, and sales channels.

84. On information and belief, the Miami MD / MiamiMD advertising campaigns using Plaintiffs' likenesses generated, supported, or contributed to revenue, customer acquisition, customer-retention value, repeat-purchase value, subscription or continuity revenue, upsell and cross-sell revenue, brand goodwill, advertising-performance data, customer data, and other commercial benefits for one or more Defendants. Plaintiffs do not presently know the internal accounting, revenue

allocation, intercompany transfers, trademark-license arrangements, advertising-account ownership, payment-processing structure, merchant-account structure, or operating-entity structure through which Defendants booked, received, allocated, transferred, reported, or distributed those revenues and benefits, and Plaintiffs' recovery is not limited by Defendants' internal accounting or brand architecture.

85. As a direct and proximate result of Defendants' unauthorized use of their likenesses and professional testimonials, Plaintiffs have suffered damages, including but not limited to the loss of reasonable model licensing fees, the diminution of the value of their likenesses, and the deprivation of their right to control the commercial use of their identities.

86. Plaintiffs' names, voices, photographs, images, testimonial footage, likenesses, identities, personas, and rights of publicity have independent commercial and licensing value. Plaintiffs earn income by licensing and controlling the commercial use of their identities, images, performances, and endorsements, including by limiting the duration, media, scope, audience, territory, products, messages, and context in which their likenesses may be used. Defendants' unauthorized uses deprived Plaintiffs of that control and of the ability to decide whether, how, where, when, and for what compensation their likenesses would be used in advertising, and did so in testimonial-style beauty advertising in which implied endorsement and product association matter.

## FIRST CLAIM FOR RELIEF

**(Breach of Contract – Booking Agreement – By All Plaintiffs Against Brand Bolt)**

87. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

88. The Booking Agreement constitutes a valid and enforceable contract between Brand Bolt and D2 Models, under which Plaintiffs are intended third-party beneficiaries.

89. The Booking Agreement expressly limited the duration of authorized use of Plaintiffs' professional testimonials and likenesses to one (1) year and required Brand Bolt to notify D2 Models and to negotiate additional fees for any usage beyond the initially permitted use.

90. Plaintiffs performed all conditions, covenants, and promises required on their part under the Booking Agreement, except for those for which they were excused.

91. Brand Bolt breached the Booking Agreement by, among other things, using Plaintiffs' professional testimonials and likenesses after the one-year authorized usage period expired without authorization.

92. The Booking Agreement imposed on Brand Bolt a continuing and recurring obligation. It provided that "It is the Client's responsibility to notify D2 Models and to negotiate additional fees (including extensions of existing agreements) for any usage, which may be required or anticipated subsequent to the time of booking." That obligation attached separately to each usage Brand Bolt required or anticipated. Each time Brand Bolt used, re-used, edited, re-edited, published, re-published, deployed, targeted, or re-targeted Plaintiffs' media in advertising after the authorized usage period, a separate duty to notify D2 Models and to negotiate additional fees arose, and Brand Bolt separately breached the Booking Agreement by failing to give that notice and failing to negotiate or pay additional fees before that usage occurred.

93. As a direct and proximate result of Brand Bolt's breach of the Booking Agreement, Plaintiffs have suffered damages in an amount to be determined at trial but in excess of $75,000.00 per Plaintiff, including but not limited to the loss of reasonable model licensing fees and related damages.

94. Pursuant to the Mutual Provision for Attorneys' Fees in the Booking Agreement, Plaintiffs are entitled to recover their reasonable attorneys' fees, costs, and expenses incurred in this action.

**<u>SECOND CLAIM FOR RELIEF</u>**

**(Breach of Contract – Model Release – By All Plaintiffs Against Brand Bolt)**

95. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

96. Each Plaintiff individually executed a Model Release directly with the Client (Brand Bolt), which constitutes a valid and enforceable contract between each Plaintiff and Brand Bolt.

97. The Model Release expressly limited the authorized use of each Plaintiff's likeness and video footage to a term of one (1) year from the session dates of February 27–28, 2021.

98. Plaintiffs performed all conditions, covenants, and promises required on their part under the Model Release, except for those for which they were excused.

99. Brand Bolt breached the Model Release by using Plaintiffs' likenesses and video footage after the expressly authorized one-year term expired and without Plaintiffs' consent.

100. Each Model Release granted Brand Bolt consent limited to a one-year term and to the video footage captured during the Shoot. Brand Bolt breached each Model Release separately each time it used, re-used, edited, re-edited, published, re-published, deployed, targeted, or re-targeted the applicable Plaintiff's likeness or footage after that term expired and without that Plaintiff's consent.

101. As a direct and proximate result of Brand Bolt's breaches of the Model Releases, Plaintiffs have suffered damages in an amount to be determined at trial but in excess of $75,000.00 per Plaintiff, including but not limited to the loss of reasonable

model licensing fees, the loss of their right to control the commercial use of their likenesses, and related damages.

**<u>THIRD CLAIM FOR RELIEF</u>**

**(Violation of California Civil Code § 3344 – Misappropriation of Likeness – By All Plaintiffs Against All Defendants)**

102. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

103. On or about January 5, 2025, Plaintiffs discovered that Defendants were using their respective names, likenesses, images, and testimonial footage for purposes of advertising, selling, and soliciting purchases of Defendants' beauty and skincare products, without Plaintiffs' prior consent, under the circumstances and for the reasons set forth above.

104. Any consent that Plaintiffs provided through the Model Release was expressly limited to a one-year term. That limited consent expired on or about February 28, 2022. Thus, Defendants' use of Plaintiffs' likenesses after that date was and is unauthorized and in violation of California Civil Code § 3344.

105. Defendants' unauthorized use of Plaintiffs' likenesses has a direct connection to the commercial purpose of advertising, selling, and soliciting purchases of Defendants' beauty products. Defendants have used Plaintiffs' likenesses and video testimonials to promote and sell products under the "MiamiMD" brand name, among others.

106. Within two years of the filing of the original Complaint in this action, Defendants generated, launched, relaunched, activated, reactivated, materially altered, translated, newly platformed, newly targeted, and re-targeted paid advertisements using Plaintiffs' likenesses. Each newly generated, launched, relaunched, activated, reactivated, materially altered, translated, newly platformed, newly targeted, re-targeted, or separately identified paid advertisement, ad variation, or platform-

generated ad ID constituted a separate knowing commercial use, re-use, publication, and/or re-publication of Plaintiffs' names, voices, photographs, images, testimonial footage, likenesses, identities, and personas for purposes of advertising, selling, and soliciting purchases of Miami MD / MiamiMD products, and each is separately actionable under California Civil Code § 3344.

107. Defendants' extraction and deployment of still images constituted a new and independent commercial use, re-use, publication, re-publication, targeting, re-targeting, and paid platform deployment of Plaintiffs' photographs, images, and likenesses in a medium the booking documents never authorized. Defendants' Spanish-language advertisements likewise constituted new and independent uses and re-publications, because Defendants translated, adapted, used and re-used, published and re-published, targeted and re-targeted Plaintiffs' likenesses to a new linguistic audience and to newly selected or re-selected audience pools. Each of the uses described in this paragraph — including the still-image deployment of on or about January 23, 2025 and the Spanish-language deployments of on or about September 19, 2025 — occurred within two years of the filing of the original Complaint in this action.

108. Within two years of the filing of the original Complaint in this action, Brand Bolt knowingly used and re-used Plaintiffs' names, voices, photographs, images, testimonial footage, likenesses, identities, and personas in and on advertisements and for purposes of advertising, selling, and soliciting purchases of Miami MD / MiamiMD products, including through the repeated editing and re-editing, publication and re-publication, targeting and re-targeting alleged above. Brand Bolt is liable under California Civil Code § 3344 because it was the contracting party, the limited license recipient, the owner or controller of the "MiamiMD" trademark, the party with the contractual duty to notify D2 Models and negotiate extended or additional use, and a beneficiary of the challenged Miami MD / MiamiMD advertising campaigns.

109. Within two years of the filing of the original Complaint in this action, Miami Skincare knowingly used, re-used, published, re-published, targeted, and re-targeted Plaintiffs' likenesses in paid Miami MD / MiamiMD advertising.

110. Within two years of the filing of the original Complaint in this action, MiamiMD LLC knowingly used, or knowingly caused and permitted the use of, Plaintiffs' likenesses in paid Miami MD / MiamiMD advertising directed to the consumer-facing sales channel it operated and from which it profited.

111. Defendants' use of Plaintiffs' likenesses was knowing and willful. Defendants entered into the Booking Agreement and the Model Releases with full knowledge of the one-year usage limitation. Defendants were put on notice of their unauthorized uses by D2 Models on January 28, 2025, and a further cease-and-desist letter from Plaintiffs' counsel on September 24, 2025, yet continued their unauthorized use.

112. As a direct and proximate result of Defendants' violations of California Civil Code § 3344, each Plaintiff has been damaged in an amount that is not yet fully ascertainable, but which exceeds the jurisdictional minimum of this court.

113. Under California Civil Code § 3344(a) Plaintiffs are each entitled to recover (a) the greater of (i) actual damages suffered as a result of the unauthorized use of each of their images and likenesses, including the reasonable value of their respective likenesses and the loss of licensing fees, or (ii) the statutory minimum of $750.00 per unauthorized use; (b) any profits from the unauthorized use that are attributable to such use and are not taken into account in computing actual damages; (c) punitive damages, as Defendants' conduct was willful, knowing, and deliberate; and (d) reasonable attorneys' fees and costs of suit. Recoverable profits, revenues, benefits, and commercial gains include, without limitation, revenues and profits derived from Miami MD / MiamiMD products, services, websites, landing pages, advertising funnels, checkout flows, affiliate funnels, subscription or continuity

programs, upsells, cross-sells, repeat purchases, customer-acquisition campaigns, and related sales channels promoted, marketed, sold, or monetized through advertisements using Plaintiffs' likenesses, regardless of whether those amounts were booked, received, allocated, transferred, reported, or distributed by Brand Bolt, Miami Skincare, MiamiMD LLC, a Doe Defendant, a related entity, an advertising vendor, a media buyer, an affiliate-program operator, a website or funnel operator, a payment processor, a merchant-account operator, or another person or entity acting by, through, for, or in concert with them.

**FOURTH CLAIM FOR RELIEF**

**(Common Law Misappropriation of Likeness – By All Plaintiffs Against All Defendants)**

114. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

115. Defendants used, re-used, published, re-published, targeted, and re-targeted Plaintiffs' names, voices, photographs, images, testimonial footage, likenesses, identities, and personas in paid advertisements to promote and sell Defendants' beauty and skincare products without authorization after the expiration of the one-year term provided for in the Booking Agreement and the Model Releases.

116. Defendants gained a commercial benefit and other advantages by using Plaintiffs' names, likenesses, and identities without authorization.

117. As a direct and proximate result of Defendants' unauthorized use of Plaintiffs' names, likenesses, and identities, Plaintiffs have been harmed and Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

118. As a proximate result of the above misappropriation of likenesses, Plaintiffs were exposed to loss of reputation, humiliation, embarrassment, hurt feeling, mental anguish, and suffering, all to their general damage in an amount according to proof.

119. In making the misappropriation described above, Defendants acted with negligence, oppression, fraud, and malice, engaging in despicable conduct carried on by Defendants with a willful and conscious disregard of Plaintiffs' rights and subjected them to cruel and unjust hardship and humiliation in conscious disregard of their rights, engaging in deceit and concealing material facts known to Defendants with the intention on the part of Defendants to thereby deprive Plaintiffs of their property rights, legal rights and otherwise to cause Plaintiffs injury, as described herein above. In doing the acts alleged herein, Defendants without Plaintiffs' consent, invaded their right to privacy by unlawfully publishing their likenesses.

120. As a direct and proximate result of Defendants' intentional, negligent and/or reckless conduct, Plaintiffs have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment as follows:

a. For compensatory damages according to proof at trial, in an amount in excess of $75,000.00 per Plaintiff;
b. For punitive and exemplary damages in an amount sufficient to punish Defendants and deter similar conduct in the future;
c. For statutory damages under California Civil Code § 3344(a) for each actionable unauthorized use or violation, in the amount of $750.00, or actual damages if greater;
d. For disgorgement, restitution, an equitable accounting, and/or imposition of a constructive trust over the profits, revenues, benefits, and commercial gains attributable to the unauthorized uses and not taken into account in computing actual damages, including revenues and profits derived from Miami MD / MiamiMD products, services, websites, landing pages, advertising funnels, subscription or continuity

programs, upsells, cross-sells, repeat purchases, customer-acquisition campaigns, and related sales channels promoted, marketed, sold, or monetized through advertisements using Plaintiffs' likenesses;

e. For an accounting of all unauthorized uses, advertisements, platforms, placements, ad IDs, creative assets, campaign records, targeting and re-targeting records, budgets, advertising spend, revenues, profits, customer-acquisition data, subscription and continuity revenue, advertising-attribution and performance data, payment-processing and merchant-account records, intercompany transfers, revenue allocations, and related records concerning the Miami MD / MiamiMD products, websites, landing pages, advertising funnels, and sales channels promoted through advertisements using Plaintiffs' likenesses;

f. For a permanent injunction prohibiting Defendants from any further use of Plaintiffs' likenesses, photographs, images, and professional testimonials;

g. For reasonable attorneys' fees and costs of suit pursuant to the Booking Agreement and California Civil Code § 3344(a);

h. For pre-judgment and post-judgment interest as allowed by law; and

i. For such other and further legal and equitable relief as the Court deems proper.

Plaintiffs demand a jury trial on all issues so triable pursuant to Fed. R. Civ. P. 38 and the 7th Amendment to the United States Constitution.

Dated: September 8, 2026 DONIGER/BURROUGHS

By: <u>/s/ *Stephen M. Doniger*</u>
Stephen M. Doniger, Esq.
David Shein, Esq.
Nelson A. Campbell, Esq.
*Attorneys for Plaintiffs*